# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
October 1, 2013 Session

## STATE OF TENNESSEE v. MATEEM HUDSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-05221      Chris Craft, Judge**

**No. W2012-01911-CCA-R3-CD  - Filed January 28, 2014**

A Shelby County Criminal Court Jury convicted the appellant, Mateem Hudson, of second degree murder, a Class A felony, and the trial court sentenced him to twenty-three years in confinement to be served at 100%. On appeal, the appellant contends that the trial court erred by allowing the State to introduce evidence about his other bad acts and that the evidence is insufficient to support the conviction. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and JERRY L. SMITH, J., joined.

Claiborne H. Ferguson (on appeal) and Jeff Woods (at trial), Memphis, Tennessee, for the appellant, Mateem Hudson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris West and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In July 2010, the Shelby County Grand Jury indicted the appellant for second degree murder in the death of Waijonel Desilva. At trial, Toni Ledmirault testified that she was the victim's mother and that the victim had "Toni" tattooed on one of her wrists. The victim was killed on Sunday, December 14, 2008. She was eighteen years old and had a two-year-old daughter at the time of her death.

Larico Nelson testified that the victim was a prostitute and worked the area of Lamar Avenue in Memphis. About midnight or 1:00 a.m. on December 14, 2008, Nelson dropped off the victim at the Mapco on Lamar Avenue near Pearson Road. About 3:00 a.m., the victim telephoned Nelson and told him to come get her because it was cold outside and she wanted to change clothes. Nelson picked up the victim at the Mapco and returned her to the Mapco about 4:00 a.m. At 7:46 a.m., the victim telephoned Nelson and asked where he was because he was supposed to have picked her up at 6:00 a.m. Nelson told the victim that he had overslept but that he would be there shortly. Nelson fell back asleep for about fifteen minutes. At 8:13 a.m., he telephoned the victim, but she did not answer. Nelson called the victim four or five times and sent her text messages, but she still did not answer. Later that day, Nelson learned the victim was dead. The next day, he met with detectives, and they looked at his car, a black 1998 Cadillac.

On cross-examination, Nelson denied being the victim's pimp. He said that he had known her about eight months at the time of her death and that they had disagreements numerous times. However, he denied fighting with her at the Mapco on December 14, 2008. He said he told the police that the victim "had an altercation with a girl out there that night."

Sergeant Cynthia Jones of the Memphis Police Department (MPD) testified that on the morning of December 14, 2008, she was dispatched to the area of Interstate 240 and Mt. Moriah Road. She arrived at the scene between 8:00 and 8:30 a.m. and saw the victim lying on the exit ramp from Interstate 240 onto Mt. Moriah. A man had parked his car on the ramp to keep vehicles from hitting the victim. Paramedics arrived, but the victim was dead.

Officer Francis Cherry, an accident reconstructionist for the MPD, testified as an expert in accident reconstruction that on December 14, 2008, he went to the exit ramp off Interstate 240 east onto Mt. Moriah and immediately noticed a set of "very pronounced" skid marks. The skid marks were "dual," meaning two tires together; were made by tires that were locked and no longer spinning; and were from the right side of a vehicle. A second set of skid marks also was present. The second set was made by dual left-side tires that were "skipping," meaning the two tires were still rolling and trying to brake but were not locked. Officer Cherry noted that tractor trailers had dual sets of rear tires.

Officer Cherry testified that the victim was lying on the exit ramp. Road rash was on her body and her clothes were torn, indicating that she had "impacted" the asphalt. The victim's arms were underneath her, tire marks were on her body, and her head was "squashed." Part of her brain was on the exit ramp, and a can of mace was "just off her hand." The victim's cellular telephone, her driver's license, and a glove were near her; a lighter, lip gloss, and cigarettes were on her person.

Officer Cherry testified that tractor trailers had identical standards set by the Department of Transportation, that he stopped a tractor trailer, and that he asked the driver if he could examine the truck and take measurements from it. Based on the measurements, the skid marks on the exit ramp, and the condition of the victim's body, Officer Cherry concluded that a tractor trailer made the skid marks and caused the victim's death. He said that the victim's shoes were still on her feet, meaning that she was not standing when the truck hit her, and that her body "had come from a height taller than a person standing . . . to cause the road rash." He could not determine whether the road rash occurred before or after the tires ran over her. The injuries to the victim's head occurred when the truck's tires ran over her head. Officer Cherry stated that a four-wheeled automobile, which was lower to the ground than a tractor trailer, would have caused additional dismemberment to the victim's body and did not cause her death.

On cross-examination, Officer Cherry acknowledged that the victim's body experienced some dismemberment. He said that he was 100% certain that a car did not cause the skid marks but that he could not say with 100% certainty that a car did not hit the victim and cause her death. He said he also could not say with 100% certainty that the victim was not erect when she was hit by the tractor trailer. Officer Cherry acknowledged that although a tractor trailer made the skid marks, he did not know when they were made.

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified as an expert in forensic pathology that he performed the victim's autopsy on December 14, 2008. The victim had various tattoos on her body, including "Toni" on the back of her left wrist. Dr. Ross found abrasions on the front of the victim's neck; the front of her right shoulder; her upper, mid, and lower chest; the top part of her left breast; the right side of her upper back; the left side of her abdomen; the lower part of her abdomen; her right and left palms; her upper knees; and her left little finger. The victim's left femur was broken, and her right elbow was broken and dislocated. A large abrasion/contusion area was on her right flank and extended onto her right buttock. Dr. Ross said that the area had "sort of a serrated appearance" that was caused by "the pattern of the object creating the injury," such as a tire. A large abrasion also was on her left lower back and buttock area. Dr. Ross noted that the abrasion was "composed of multiple transverse or horizontally oriented striations" and that the striations were consistent with road rash. The victim had additional abrasions and a laceration on the back of her left thigh.

Dr. Ross testified that the victim had a three-inch laceration across her forehead that extended onto the front part of her scalp. The laceration was open to the skull, and Dr. Ross saw skull fragments through the wound. The victim had large abrasions on her cheek and chin and an abrasion on her left temple. The left side of her jaw was broken. She had a six-inch laceration across the left side of her head that was open to the skull, and Dr. Ross saw

bone fragments and brain tissue inside the wound. Dr. Ross stated that the victim had a "crushing type" injury to her head and multiple skull fractures. She had severe traumatic brain injury with multiple crushing lacerations, and portions of her brain had been eviscerated though the lacerations. The base of her skull had been dislocated due to the extent of the fracturing, and portions of her spine had been broken. The victim had multiple rib fractures and lacerations to her lungs, liver, and spleen. She had a crushing-type fracture to her pelvic bone, and toxicology tests showed small amounts of marijuana products in her system.

Dr. Ross testified that the victim's head injuries were fatal. Her other injuries also would have been fatal. He diagnosed her with severe blunt force injuries to the head, torso, and extremities and concluded that her cause of death was multiple blunt force injuries. Dr. Ross swabbed the victim's hands, collected hair samples, and collected scrapings from her fingernails. He found a paint chip inside her body bag and gave all of the evidence to the MPD.

Carmond Taylor testified that on the night of December 13, 2008, she worked as a prostitute on Lamar Avenue. About 8:00 a.m. on December 14, Taylor noticed a TransCarrier tractor trailer truck. The driver blew the horn to get her attention, and Taylor went to the truck to meet him. She got into the truck's cab and spoke with the driver, who was the appellant. Taylor agreed to perform sex acts for $60, and she and the appellant got into the back of the cab. The appellant told Taylor to put her hands together and asked her the location of her cellular telephone, which she thought was unusual. She said that she immediately tried to get away from him and get out of the cab but that he punched her in the face, started fighting her, and ripped off her clothes. Taylor stopped fighting the appellant, and he duct-taped her wrists and ankles together.

Taylor testified that the appellant got into the driver's seat and began driving the truck. She said, "He started to turn around and look at me and was saying how pretty I was and why did he do this to me. And then he started talking about how he hated prostitutes and maybe this would help me to stop and all this." After a while, the appellant removed the duct tape, allowed Taylor to put her clothes back on, and allowed her to sit in the front of the cab with him. She said he told her that "you better not jump out [of] this truck because I'm going real fast, I'm going like a hundred miles an hour and if you [jump] out, it's going to kill you and nobody is going to know who did it to you." Taylor said that she fell asleep and that the appellant drove to Crossville. The appellant asked Taylor if she was hungry and stopped at a Pilot truck stop. He told her that he did not have any money and asked if she had money. Taylor gave him a twenty-dollar bill and watched him go inside the Pilot. She got out of the truck and talked with another truck driver, who wrote down the license tag number for the appellant's truck. Taylor went inside the truck stop, and someone called the police. She said

-4-

she went to a hospital, and she identified for the jury photographs showing duct tape residue on her ankles, arms, and neck.

On cross-examination, Taylor denied stealing money from the appellant or attacking him when he accused her of stealing money. She acknowledged that although the appellant duct-taped her wrists and ankles, he later removed the tape and left her unattended in the truck. She also acknowledged that she gave a statement to the Crossville police on December 14 and that she did not tell them the appellant claimed he hated prostitutes or threatened to kill her. Taylor gave a statement to the Memphis police on December 19 and told them that she thought the appellant was going to kill her, not that he said he was going to kill her. She acknowledged that the appellant told her she would be hurt or killed if she jumped out of the moving truck and that his statement was true. On redirect examination, Taylor acknowledged that in later statements to police, she told them that the appellant said he hated prostitutes, would run over her if she jumped out of the truck, and could kill her and no one would be able to connect him to the crime.

Officer William A. Padgett of the Crossville Police Department (CPD) testified that at 3:42 p.m. on December 14, 2008, he went to the Pilot truck stop at exit 320 on Interstate 40 in response to a reported kidnapping. When he arrived, Carmond Taylor was in the back of an ambulance. She had a laceration on her lower lip, a cut across the bridge of her nose, and "remants" of duct tape on her lower legs. Officer Padgett spoke with Taylor and issued a BOLO, be-on-the-lookout, for a white tractor trailer with TransCarrier logos on the sides and driven by an African-American male with dreadlocks. Later, an officer from the Cumberland County Sheriff's Department stopped the truck.

Detective Lieutenant Gene Hall of the CPD testified that on December 14, 2008, he went to the hospital emergency room and spoke with Officer Pagdett and Carmond Taylor. The officers took Taylor's statement, which she wrote out herself. An officer had stopped a TransCarrier truck at mile marker 336 on Interstate 40, and Detective Hall notified officers at the MPD. The Memphis officers asked Detective Hall to impound the truck, so Detective Hall put a trash bag over the driver's seat and had the owner of a local wrecker yard drive the truck to Crossville's city impound lot. Detective Hall said that the trailer was "dropped" in a parking lot and that the tractor was parked inside the impound building. Detective Hall looked over the trailer and found what appeared to be blood, flesh, and hair under the rear of the trailer on the passenger side. He also found what appeared to be blood splatter on the trailer's rear bumper. The biological material was collected as evidence. On cross-examination, Detective Hall testified that he did not see any damage or biological material on the tractor.

Major Mark Rosser of CPD testified that on December 14, 2008, he went to the city

impound lot to assist Detective Hall with the collection of evidence. When he arrived, the TransCarrier trailer was being unloaded, and he noticed that the load inside the trailer had been shifted forward. Major Rosser looked at the trailer's tires and saw that the rear passenger-side tires had "flat spots," which he concluded had been caused by a sudden stop of the vehicle. Major Rosser cleaned and "inked" the tires and put sheets of posterboard in front of them. An employee from the city's public works department hooked a tractor to the trailer and slowly pulled the trailer forward, leaving the tread pattern from the trailer's tires on the posterboard. On cross-examination, Major Rosser testified that he had no certification or training on the cause of wear or defects on tires and that he was testifying about the cause of the flat spots from his personal experience with large trucks while a transport operator in the military and his personal experience with patrol cars.

Lieutenant Wilton Cleveland of the MPD testified that on December 14, 2008, he and several other officers drove to Crossville to investigate the kidnapping of Carmond Taylor. Lieutenant Cleveland inspected the impounded TransCarrier trailer and saw what appeared to be human hair and flesh under the rear of the trailer on the right side. Lieutenant Cleveland spoke with the appellant, collected his clothes, and swabbed the inside of his right ear. All of the evidence was turned over to the Tennessee Bureau of Investigation (TBI) Crime Laboratory.

Lieutenant Ryan Thomas of the MPD testified that he was one of the officers that accompanied Lieutenant Cleveland to Crossville and met with the appellant. Lieutenant Thomas collected the appellant's wallet and other personal items. He also collected two oral swabs from the appellant.

Lieutenant Barry Hanks of the MPD testified that he directed the investigation of the victim's death. On the morning of December 14, 2008, Larico Nelson telephoned the police department and came to the homicide office. Lieutenant Hanks spoke with Nelson, and Nelson answered all of the officer's questions. Nothing seemed to be amiss with Nelson's story. Lieutenant Hanks looked at Nelson's black Cadillac but did not see any damage to the car that would have been caused by running over a person. Lieutenant Hanks looked for blood, tissue, and hair under the car and in the car's wheel wells but did not find anything and concluded that Nelson was not involved in the victim's death. Lieutenant Hanks obtained video surveillance from the Mapco at Lamar Avenue and Pearson Road but did not see the appellant or the victim in the video. He learned that Lieutenant Cleveland was going to Crossville and asked Lieutenant Cleveland to look under the impounded tractor trailer for biological remains.

Lieutenant Hanks testified that on April 20, 2009, he talked with the appellant. He said that he advised the appellant of Miranda rights and that the appellant agreed to speak

with him but "would not put anything on paper." The appellant told Lieutenant Hanks that on December 14, 2008, he picked up his truck at TransCarriers in Byhalia, Mississippi, about 7:00 a.m. The appellant drove to a truck stop and then to the Mapco on Lamar Avenue to buy cigarettes. Lieutenant Hanks asked the appellant about Carmond Taylor, and the appellant said he told Taylor that he would run over her if she got out of the truck. The appellant said he was the exclusive driver of the truck and denied being at the Mt. Moriah exit on December 14.

On cross-examination, Lieutenant Hanks testified that Nelson was a "person of interest" in the case. He acknowledged telling the appellant that the victim had been released from the hospital and that the victim had identified him as the person who had run over her. The appellant denied having had any contact with the victim. Lieutenant Hanks later told the appellant that the victim was dead, and the appellant maintained that he had not had any contact with her.

On redirect examination, Lieutenant Hanks testified that Byhalia was near the Tennessee/Mississippi line and five miles or less from the Mapco on Lamar Avenue. Lieutenant Hanks asked the appellant how the victim's biological material got onto his truck, and the appellant said the police put it there.

Timothy Smith testified that on April 8, 2012, police officers arrested him for being a felon in possession of a handgun and put him in jail. The appellant was in the cell beside Smith's cell. Smith said that one morning, he heard the appellant and another man talking. The appellant told the man that he had picked up a girl on Lamar Avenue and that she got into his truck. The appellant stopped at a store and went inside. When he got back into his truck, the girl and his wallet were gone. The appellant found the girl back on the street. Smith said the appellant told the man that all he had wanted was to get his money back and that he "had to run that [bi***] over." The next day, Smith made bond and called the district attorney's office. On April 10, 2012, Smith viewed a photograph array and identified the appellant's photo. He said that he had not asked the district attorney's office for any help with his cases and that he had not been promised anything in exchange for his testimony. On cross-examination, Smith acknowledged that at the time of the appellant's trial, Smith was on probation for kidnapping and robbery and that the case for his possession of a handgun was still pending.

Agent Suzann Lafferty of the TBI's Violent Crime Response Team testified as an expert in latent fingerprint analysis and identification that on December 16, 2008, she went to Crossville and processed the exterior of the TransCarrier tractor for fingerprints. She collected latent prints and compared them to known prints from the victim, Carmond Taylor, and the appellant but was unable to match prints from the tractor to any of them. The tractor

was towed to the TBI's Crime Laboratory in Nashville, and Agent Lafferty vacuumed the interior to collect fiber evidence. She also inventoried, itemized, and submitted as evidence everything from the cab, including a wad of duct tape she found on the bed in the cab's sleeping compartment. Agent Lafferty processed the items for fingerprints but did not find the victim's fingerprints on anything. She found two of Carmond Taylor's fingerprints on a plastic container on the bed and thirty-four of the appellant's fingerprints inside the cab, including his palm print on a roll of duct tape.

Linda Littlejohn, a forensic scientist supervisor with the TBI Crime Laboratory, testified as an expert in forensic micro analysis that she examined the fibers collected by Agent Lafferty and compared them to fibers from the victim's clothing. Agent Littlejohn found no evidence of fiber transfer between the victim and the truck.

Laura Lee Staples testified as an expert in forensic analysis of biological fluids and DNA that she worked for the TBI's Serology/DNA Laboratory in 2008 and analyzed blood and tissue collected from underneath the rear of the TransCarrier trailer. She also analyzed the fingernail scrapings collected from the victim. The DNA from the scrapings matched only the victim. The blood and tissue from the trailer also matched the victim. At the conclusion of Staples's testimony, the State rested its case.

Deputy James Porter testified for the appellant that he was employed at the Shelby County Jail and that the appellant was housed in Deputy Porter's housing unit with ten other inmates. On April 9, 2012, Timothy Smith also was housed in Deputy Porter's unit. That morning, the appellant left the jail and went to court. Deputy Porter stated that while the appellant was gone, Deputy Porter heard three inmates in cell number four talking about the appellant's case and that one of the inmates said, "[I]f you all want a time cut, just write the district attorney and sign on his case." During the conversation, the door to cell number seven, Smith's cell, was open, and Smith was standing in the doorway. Deputy Porter said that he had never heard the appellant discuss the appellant's case with anyone. On cross-examination, Deputy Porter acknowledged that a couple of cells separated cell number four from cell number seven.

At the conclusion of the proof, the jury convicted the appellant as charged of second degree murder, a Class B felony. After a sentencing hearing, the trial court sentenced him to twenty-three years to be served at 100%.

## II. Analysis

### A. Admissibility of Appellant's Other Bad Acts

The appellant contends that the trial court erred by allowing Carmond Taylor to testify about her interaction with him on the morning of December 14, 2008, because the evidence was inadmissible pursuant to Rule 404(b), Tennessee Rules of Evidence. The State argues that the trial court properly admitted the evidence in order to show the appellant's identity, intent, and motive. We agree with the State.

Before trial, the State filed a motion notifying the appellant of its intent to have Taylor testify at trial. In the motion, the State argued that Taylor's testimony was admissible to show that the appellant intended to kill the victim, to establish his identity as the driver of the truck at the time of the victim's death, and to provide the jury with a complete story of the events surrounding the victim's death and the appellant's arrest.

At a pretrial hearing on the motion, Taylor testified that on December 14, 2008, she was a prostitute and that the appellant picked her up at 8:30 or 9:00 a.m. on Lamar Avenue. She said that she got into his truck, that they "agreed upon doing something for an amount of money," and that they got into the back of the cab where there was a bed. The appellant was holding duct tape and told her to put her hands together. He also asked if she had a telephone. Taylor tried to get away from him, and they started fighting. The appellant pushed her down and punched her lip. Taylor said the appellant was hitting her head and that she stopped fighting him because she thought she was going to pass out. The appellant duct-taped her hands behind her back, put her feet up, and taped her feet to her hands. He got into the front seat of the truck and drove away.

Taylor testified that shortly thereafter, the appellant stopped the truck, got into the back of the cab, and forced her to perform oral sex on him. Then he started driving the truck again. She said he apologized to her, told her that she was pretty, and told her that he hated prostitutes. He stopped the truck, took the duct tape off, allowed her to put her clothes back on, and allowed her to sit in the front of the cab with him. Taylor said the appellant told her that "you better not jump out [of] this truck because I'm going fast and if you jump out, I'm going to kill you, I'm going to run you over, I'm not going to stop." Taylor fell asleep for a couple of hours. Soon after she woke, the appellant exited Interstate 40 in Crossville and pulled into a Pilot truck stop. Taylor gave the appellant money to buy them something to eat and watched him go inside. She got out of the truck, talked to a truck driver, and went to the manager's office in the truck stop for help. At some point, she saw the appellant walk out of the Pilot. At the conclusion of her testimony, she said that while she was in the truck, she spit blood around the cab so people would know she had been there.

On cross-examination, Taylor acknowledged that she had been awake all night prior to the incident. However, she denied that she had been using drugs. She said that "TransCarriers" was written on the side of the truck's trailer and tractor and that she had

never seen the appellant before December 14. She denied that the appellant accused her of stealing money from him but acknowledged that he took the duct tape off her after he raped her, allowed her to sit in the front seat with him, and talked with her. She also acknowledged that he voluntarily left her alone in the truck while he went into the Pilot. She said she told the police that the appellant claimed he hated prostitutes.

The State advised the trial court that the victim also was a prostitute and that its theory of the case was that the appellant picked up the victim on Lamar Avenue, took her to Mt. Moriah at Interstate 240, and ran over her. The State argued that Taylor's testimony was admissible to prove the appellant's identity as the victim's killer because "Miss Taylor can put him in the truck." The State also argued that Taylor's testimony was admissible to prove he intentionally killed the victim because his statements "go directly to his intent, his [state] of mind, the lack of mistake." The State claimed that Taylor's testimony about the appellant's binding her with duct tape was necessary because "he could be making those statements and the jury will be going, well, why was she even in the truck, why didn't she jump out, why didn't she just leave. Well, clearly, he was keeping her from doing that, so without that context, [his] statements don't make any sense." Defense counsel contended that Taylor's testimony was inadmissible propensity evidence. Regarding the State's need to establish the appellant's identity, defense counsel argued that Taylor's testimony was unnecessary because other evidence could link him to the vehicle. Counsel did not address the State's intent or context arguments.

The trial court, relying on State v. Kiser, 284 S.W.3d 287 (Tenn. 2009), concluded that the evidence was relevant to prove the appellant's intent and motive.[1] As to the appellant's intent, the trial court stated that the evidence rebutted "accident or mistake defenses, wherein the defense might say, well, I ran her over because she jumped out in front of my truck, etc." Regarding motive, the trial court stated that although the State did not have to prove motive, "sometimes it's something the State wants to prove as well as identity." The court determined that the evidence was relevant to prove the appellant's identity but noted that the State had "plenty of other evidence . . . as far as his being connected to the truck." The trial court found Taylor credible and, therefore, clear and convincing evidence that the appellant had kidnapped and raped her. The trial court concluded that the evidence was prejudicial but "very probative" to show the appellant's motive and lack of mistake or accident. Therefore, the trial court ruled that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court determined that the jury did not need to hear evidence about the appellant's raping Taylor "for all this to apply." However, the trial court stated that "if we excluded the duct tape part, then why in the world is she riding with him to Nashville. And it just would not make a lot

_____

[1]Judge James C. Beasley, Jr., presided over the 404(b) hearing.

of sense to the jury." At the conclusion of the hearing, the trial court summarized its ruling as follows: "I'm finding that a material issue exists other than conduct conforming with a character trait, and that is his identity, his motive, and absence of mistake or accident and the issue of identity I think is not as material as the other two."

The appellant contends that the trial court erred by allowing Taylor to testify. Regarding the admissibility of her testimony to show his identity, he claims that the trial court erred because the State had less prejudicial evidence, such as GPS data and his admission to Sergeant Hanks about being the only driver of the truck. Regarding the admissibility of Taylor's testimony to prove his mental state, he contends that the State only had to prove that he knowingly killed the victim. Therefore, use of the evidence to show that he intended to kill the victim was "excessive." As to the admissibility of the evidence to negate a claim of mistake or accident, the appellant claims that the trial court erred because "Defendant made no claim of his own personal mistake or accident in the death of [the victim]. Rather, the defense's theory was that [she] jumped out of the truck on her own accord. Any claim of mistake or accident would have been on the part of [the victim]." Finally, the appellant claims that the trial court erred by admitting Taylor's testimony about the assault and kidnapping because a lack of the evidence would not have created a chronological or conceptual void in the State's case or confused the jury. The State argues that the trial court properly admitted Taylor's testimony to show the appellant's motive, intent, and identity.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). "In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so." Kiser, 284 S.W.3d at 288. Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

However, such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). "Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses." Kiser, 284 S.W.3d at 288 (citing Tenn. R. Evid. 404(b), Advisory Comm'n Cmts, and State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985)). Admissibility of other crimes, wrongs, or acts is also contingent upon the trial court finding by clear and convincing evidence that the prior crime, wrong, or act was actually committed. Tenn. R. Evid. 404(b); Wyrick, 62 S.W.3d at 771. The jury may consider evidence admitted under 404(b) as substantive evidence at trial.

Wyrick, 62 S.W.3d at 771.

Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). "However, in view of the strict procedural requirements of Rule 404(b), the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." Id.

Turning to the instant case, the State informed the jury during opening statements that the evidence would show that the appellant intentionally killed the victim and would show why he killed her. The State's case established that the appellant and the victim did not know each other until shortly before her death on December 14, 2008. Shortly after her death, the appellant picked up Taylor, another prostitute, physically assaulted her, and kidnapped her. He told Taylor that he hated prostitutes and that he would run over her if she jumped out of the truck. Meanwhile, the victim was found lying on the exit ramp with road rash and tire marks over her body. The right rear tires of a tractor trailer truck had run over her head. Through his cross-examination of the State's witnesses, defense counsel tried to infer to the jury that Nelson had been arguing with the victim before her death, that she was walking or standing on the exit ramp, and that a car struck her. Moreover, during closing arguments, defense counsel argued that Nelson was the last person to know the victim's whereabouts, that the victim "supposedly" got into the appellant's truck, that she and the appellant argued, and that the victim jumped out. Counsel contended that the proof did not show that the tires

-12-

of the appellant's truck ran over the victim and that "even playing devil's advocate," the proof did not show that he swerved to hit her. Counsel noted that the police did not find any forensic evidence linking the victim to the inside of the tractor and argued that she had never even been inside the truck. He then stated as follows:

> Identity is an issue here, ladies and gentlemen. And it's an issue because no one has identified Mr. Hudson as the driver of that vehicle prior to any time, okay, other than Carmond Taylor.
>
> She's the only one that identified him as the driver of that vehicle.

The appellant's identity as the driver of the truck, his motive to kill the victim, and his intent to kill her were paramount to the State's case. The appellant's telling Taylor that he hated prostitutes was highly relevant to show his motive for killing the victim. See Kiser, 284 S.W.3d at 291 (concluding that defendant's general animosity toward police was relevant to the State's theory that he shot and killed police officer). Moreover, the appellant's telling Taylor that he would run over her if she jumped out of the truck and that no one would know he killed her was highly relevant to show he intentionally ran over the victim. Although the appellant claims that the State's use of Taylor's testimony to prove he intentionally killed the victim was excessive because the State alleged that he knowingly killed the victim, a finding that a defendant acted intentionally necessarily establishes that the defendant acted knowingly. See Tenn. Code Ann. § 39-11-301(a)(2). Therefore, the State's use of the evidence to prove that the appellant acted intentionally was logical trial strategy. Regarding Taylor's testimony to establish the appellant's identity as the driver of the truck, we agree with the trial court that Taylor's testimony was less material to the State's case because other evidence, such as the appellant's statement that he was the sole driver of the truck, established that fact. Nevertheless, the trial court properly ruled that Taylor's testimony was highly relevant to show the appellant's motive and intent.

Granted, Taylor's testimony was prejudicial. However, given the highly probative value of the appellant's statements to Taylor, we cannot say that the probative value of the evidence was outweighed by the danger of unfair prejudice. As to the appellant's claim that the trial court should have prohibited Taylor from testifying about his physically assaulting and kidnapping her, we agree with the trial court that the testimony was necessary to provide context for his statements. For the jury to have heard that the appellant told Taylor he hated prostitutes and that he would run over her if she jumped out of the truck but that he picked her up, allowed her to sit in the front seat with him, talked with her, went inside the Pilot to buy them something to eat, left her alone inside the truck, and did not harm her in any way would have misled the jury and seriously called into question her credibility. Therefore, we

conclude that the trial court properly ruled the evidence was admissible.

## B. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because the proof does not show that he knowingly killed the victim. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). Moreover, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct

when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). As noted previously, Tennessee Code Annotated section 39-11-301(a)(2) provides, "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a).

Taken in the light most favorable to the State, the evidence shows that sometime between 7:45 a.m. and 8:15 a.m. on the morning of December 14, 2008, the appellant picked up the victim, a prostitute, at the Mapco on Lamar Avenue. Shortly thereafter, he either pushed her out of his truck or she jumped out to get away from him as he was exiting Interstate 240 onto Mt. Moriah Road. While the victim was lying on the exit ramp, the appellant ran over her with the rear tires of his tractor trailer, crushing her skull and causing other catastrophic injuries. The appellant did not attempt to help the victim. Instead, he returned to Lamar Avenue and picked up Carmond Taylor, also a prostitute. He physically assaulted Taylor, bound her with duct tape, and told her that he hated prostitutes. At some point, the appellant removed the duct tape and allowed Taylor to sit in the front of the truck with him. However, Taylor said he warned her that he would run over her if she jumped out, that he would not stop, and that no one would know he was responsible. While the appellant and Timothy Smith were in jail, Smith heard him say that he "had to run that [bi***] over." Based upon the evidence, a reasonable jury could have concluded that the appellant intentionally ran over the victim after she jumped out of his truck and was lying on the exit ramp. Therefore, the evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-15-